ANDERSON, Circuit Judge,
concurring specially:
I concur in the result and agree with the opinion of the majority insofar as it determines that the Fourth Amendment right at issue was not clearly established, and insofar as it determines that Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), does not bar Holm- *1253 berg’s suit. However, I respectfully disagree with the majority opinion insofar as it concludes that there has been a violation of McClish’s Fourth Amendment rights.[1] This is an issue with which courts have struggled, and on which there is a split of authority.
In my judgment, the controlling case is United States v. Santana, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). In Santana, police officers saw the suspect perched on the threshold of her doorway, where “one step forward would have put her outside, one step backward would have put her in the vestibule of her residence.” Id. at 40 n. 1, 96 S.Ct. at 2408 n. 1, 96 S.Ct. 2406. The Court, on its way to a hot pursuit holding, held that it would have been legal for the officers to arrest Santana in her initial position, even though they only had probable cause and had not obtained a warrant. The Court concluded that Santana was in a public place, which meant that no warrant would have been required, pursuant to United States v. Watson, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). The Court reasoned:
While it may be true that under the common law of property the threshold of one’s dwelling is “private,” as is the yard surrounding the house, it is nonetheless clear that under the cases interpreting the Fourth Amendment Santana was in a “public” place. She was not in an area where she had any expectation of privacy. “What a person knowingly exposes to the public, even in his own house or office, is not a subject of Fourth Amendment protection.” Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). She was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house .... Thus, when the police, who concededly had probable cause to do so, sought to arrest her, they merely intended to perform a function which we have approved in Watson.
Santana, 427 U.S. at 42, 96 S.Ct. at 2409.
The instant case is legally indistinguishable from Santana. When the police officers knocked, McClish voluntarily opened the door, thereby exposing the doorway area to the view of the police.[2] Then, *1254 under McClish’s version of the facts, the police officers reached in and grabbed him for the purpose of drawing him onto the porch and arresting him. Because the police officers only reached across the plane of the door, it is clear that it was physically impossible for them to see any more of the home than McClish allowed them to see when he opened the door. Like Santana, McClish “knowingly expose[d]” both himself and the immediate area behind his threshold to public view. McClish no longer had an “expectation of privacy” that the officers could have violated. He was therefore in a “public” place, just as Santana was, and under Watson the police needed only probable cause, and not a warrant, to arrest him. The officers admittedly had probable cause to arrest, so they did not violate McClish’s rights under the Fourth Amendment.
The majority opinion relies on Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), to conclude that the police officers violated McClish’s constitutional rights because their arms passed the physical plane of the door to his home, and a warrant would have been necessary to justify this intrusion. Payton held that officers must, absent exigent circumstances, obtain a warrant before they may enter a suspect’s home to arrest that suspect. Id. at 590, 100 S.Ct. at 1382.
Payton, however, was not a doorway arrest case. The issue in Payton was simply “whether and under what circumstances an officer may enter a suspect’s home to make a warrantless arrest.” Id. at 575, 100 S.Ct. at 1374. The Court characterized this issue as “narrow.” Id. at 582, 100 S.Ct. at 1378. And the facts in Payton involved officers penetrating well into the interior of a suspect’s home, not simply reaching through an opened door. In Payton’s ease, officers knocked down the door and entered well into the interior of the dwelling. In the companion case of Riddick, the suspect’s son answered the door, and in order to arrest the suspect, officers had to enter well into the interior of the home. The Court therefore did not have an occasion to express a holding on the doorway arrest scenario, which lies on the boundary between Payton and Watson.
Santana, on the other hand, was a doorway arrest case, and is the Supreme Court’s last and only word on the Fourth Amendment rule at the opened door. It explicitly rejected a test at the threshold that would depend on the plane of the door. The Court said, “While it may be true that under the common law of property the threshold of one’s dwelling is ‘private,’ as is the yard surrounding the house, it is nonetheless clear that under the cases interpreting the Fourth Amendment Santana was in a ‘public’ place.” Santana, 427 U.S. at 42, 96 S.Ct. at 2409. The Court, in stating its holding, specifically used the word “threshold”; acknowledged that the threshold was a significant property law concept; declined to accord that concept any significance in defining the scope of the warrant requirement; and, even though Santana’s body was partially inside that property-law threshold, adopted an expectation-of-privacy test and held that the arrest would have been constitutional. Id. Santana therefore states the proper test at the voluntarily opened doorway.
Instead of following Santana’s expectation-of-privacy holding, the majority opinion relies on language drawn from the *1255 Payton opinion that, in its view, adopted a plane-of-the-door rule at the opened doorway. See Payton, 445 U.S. at 589, 100 S.Ct. at 1381 (“[T]he critical point is that any differences in the intrusiveness of entries to search and entries to arrest are merely ones of degree rather than kind. The two intrusions share this fundamental characteristic: the breach of the entrance to an individual’s home.”) (emphasis added); id. at 590, 100 S.Ct. at 1382 (“[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.”) (emphasis added).
This language from Payton did not overrule the clear holding in Santana. The Court said nothing specific about arrests at the opened doorway, and did not make any choice between a plane-of-the-door or an expectation-of-privacy rule. In fact, the language about threshold is best read as dicta. Its rhetorical source is William Pitt’s famous quote about the home, cited in Payton:
There can be no doubt that Pitt’s address in the House of Commons in March 1763 echoed and re-echoed throughout the Colonies: “The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter — all his force dares not cross the threshold of the ruined tenement!”
Payton, 445 U.S. at 601 n. 54, 100 S.Ct. at 1388 n. 54 (emphasis added). Payton’s language about crossing the threshold seems to have been drawn directly from this speech. And neither Payton nor Pitt expressed an opinion on open doorway arrests.[3] Rather, they were using “crossing the threshold” to mean “entering the home.” Both Pitt and Payton were engaging in the literary device of synec-doche, whereby a part of a thing is used to refer to the whole, as in the phrase “all hands on deck” to refer to “all sailors on deck.” They both used “threshold” to refer in a rhetorical way to the “home.”
Payton simply did not speak to the doorway arrest scenario, and the rhetorical use of the word “threshold” should not be relied upon as having decided the question of the appropriate test at the opened doorway. Payton nowhere opined about whether a plane-of-the-door or an expectation-of-privacy test governs at the opened doorway. The Payton holding is thus essentially neutral with respect to the proper rule for doorway arrests. Santana, on the other hand, explicitly rejected a property law, plane-of-the-door rule, and said that a warrantless arrest is proper so long as the suspect has no expectation of privacy. It therefore contains the controlling principle of law in the doorway arrest situation.
In order to choose the dicta of Payton over the holding in Santana, the majority must and apparently does argue that Pay-tan overruled Santana, or at least confined it to its specific facts.[4] This conclusion is *1256 unwarranted. In the first place, it is clear that Payton did not overrule Santana. The Court does not overrule precedents sub silentio. See Agostini v. Felton, 521 U.S. 203, 237, 117 S.Ct. 1997, 2017, 138 L.Ed.2d 391 (1997) (“We reaffirm that if a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.”). Nor is it appropriate to read Payton as overruling Santana. At the time of Payton, Santana was only four years old, and postdated Watson, the seminal public arrest case, by a mere six months.
Moreover, in Payton the Court actually cited Santana, without overruling or even questioning it, in its string cite of prior cases dealing with “public” arrests. See Payton, 445 U.S. at 575 n. 1, 100 S.Ct. at 1374 n. 1. The Santana Court had been aware of the issue of warrantless in-home arrests: Justice White specially concurred to make it clear that he believed warrant-less in-home arrests were constitutional as a general matter so long as officers had probable cause. See Santana, 427 U.S. at 43-44, 96 S.Ct. at 2410 (White, J., concurring). Despite this awareness of the home issue, Santana adopted an expectation-of-privacy test at the opened doorway. Yet Payton did not overrule Santana, and its arrest holding has never been questioned since. The best reading of this history is that Santana sets forth the proper rule at the opened doorway.[5]
It is also clear that the reasoning of Payton did not implicitly undermine the Santana holding. The rationale for Pay-ton was the protection of the privacy of the home. The Court concluded that, even though probable cause gives officers a right to arrest the suspect, the privacy of the home justifies the additional protection of the warrant in a home arrest situation. Payton, 445 U.S. at 588, 100 S.Ct. at 1381. As a result, the Payton opinion is suffused with privacy-protection reasoning. See id. (“[A]n entry to arrest and an entry to search for and to seize property implicate the same interest in preserving the privacy and the sanctity of the home, and justify the same level of constitutional protection.”) (emphasis added); id. at 588 n. 26, 100 S.Ct. at 1381 n. 26 (“The decisions of this Court have time and again underscored the essential purpose of the Fourth Amendment to shield the citizen from unwarranted intrusions into his privacy.”) (emphasis added); id. at 589, 100 S.Ct. at 1381 (“The Fourth Amendment protects the individual’s privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual’s home — a zone that finds its roots in clear and specific constitutional terms.”) (emphasis added); id. at 596, 100 S.Ct. at 1385 (“The common-law sources display a sensitivity to privacy interests that could not have been lost on the Framers.”) (emphasis added).
*1257 The Santana rule is consistent with Payton’s privacy-protection rationale. Santana simply says that when a suspect has voluntarily relinquished the privacy of the home in the doorway area, the Payton concern for the privacy of the home is not present and the public arrest rule of Watson applies. The suspect need not open the door. But if he chooses to do so, the officers do not offend the rationale of Pay-ton by simply reaching in and grabbing him.[6]
The majority opinion argues that the Santana approach erodes the protection of Payton because it allows officers to seize whatever they can see inside a home through an opened door. But the Santana approach does not extend that far. The Santana rule operates only insofar as the suspect voluntarily relinquishes some of the privacy of the home. In other words, the Santana rule subjects to seizure only what the officer can seize without seeing more of the home than was voluntarily exposed. Thus, the officer can seize the suspect who is within reach of the officer standing at the threshold because the officer does not thereby intrude further on the suspect’s privacy than what the suspect had voluntarily relinquished. On the other hand, the officer who arrested Rid-dick in Payton could not reach Riddick while standing at the opened door. He walked past the opened door, into the house, thus intruding further upon privacy than the voluntary opening of the door exposed. From the interior of the house, where the officer seized Riddick, the officer could see details and areas of the house not voluntarily exposed by the opening of the front door. That was the constitutional violation in Riddick’s case. See also Kyllo v. United States, 533 U.S. 27, 37, 121 S.Ct. 2038, 2045, 150 L.Ed.2d 94 (2001) (“In the home, our cases show, all details are intimate details, because the entire area is held safe from prying government eyes.”) (emphasis in original).
The scope of Santana is thus consistent with Riddick’s case and does not under *1258 mine the Payton rule, contrary to the majority’s suggestion. In fact, by leaving the door closed, a suspect can always, in the absence of exigent circumstances or some other exception to the warrant requirement, force officers to obtain a warrant before entering the home to arrest. And by opening the door, the suspect loses the protection of the Payton rule only insofar as the officers can accomplish the arrest without seeing any detail that the suspect did not voluntarily expose.
Not only has Santana never been overruled or even questioned by the Supreme Court, and not only is it in harmony with the rationale of the Payton decision: it is also more consistent with Fourth Amendment jurisprudence in general than the majority opinion’s approach. The majority opinion reads Payton to support a bright-line rule at the property-law plane of the opened door. But bright-line rules are generally disfavored under the Fourth Amendment’s global command of “reasonableness.” In Ohio v. Robinette, 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996), the Court said, “We have long held that the touchstone of the Fourth Amendment is reasonableness. Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances. In applying this test we have consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry.” Id. at 39, 117 S.Ct. at 421 (citing Florida v. Bostick, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); Michigan v. Chesternut, 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988); Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); and Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)).
The disfavored status of bright-line rules in the Fourth Amendment area means that the Court never adopts such rules by implication or sub silentio. In every case where the Court has adopted a bright-line rule, the Court has taken great pains to justify why the normal presumption against such rules should be disregarded in the particular context. For example, in New York v. Belton, 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981), the Court held that the entire interior of an automobile is within the grab area of an arrestee for purposes of the Chimel search-incident-to-arrest rule. The Court explicitly discussed why other more nuanced rules were unworkable, and ultimately decided in no uncertain terms “to establish the workable rule this category of cases requires.” Id. see also Oliver v. United States, 466 U.S. 170, 181-82, 104 S.Ct. 1735, 1743, 80 L.Ed.2d 214 (1984) (explicitly justifying bright-line rule that open fields are not protected by Fourth Amendment); United States v. Robinson, 414 U.S. 218, 234-35, 94 S.Ct. 467, 476, 38 L.Ed.2d 427 (1973) (explicitly justifying search incident to arrest -without regard to individualized assessment of dangerousness).
Payton, by contrast, contains no discussion at all of the bright-line-rule issue. It did not explicitly state that the law at the opened doorway would be governed by the plane of the door. Nor did it contain any reasoning to justify such a result. Rather, it simply contained the language about “entrance” and “threshold,” which it used rhetorically to refer to “the home.” Pay-ton therefore cannot be read to establish a disfavored bright-line rule at the plane of the opened doorway, especially in light of Santana’s countervailing holding that is directly on point.[7]
*1259 A plane-of-the-door rule is doubly disfavored because the Court does not ordinarily define Fourth Amendment protections by reference to property-law concepts. Since Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), it has been clear that the Fourth Amendment protects privacy, not property. See id. at 353, 88 S.Ct. at 512 (“[T]he premise that property interests control the right of the Government to search and seize has been discredited .... [T]he reach of [the] Amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure”). The warrant requirement too ordinarily serves to protect privacy. See Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948) (“When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Gov *1260 ernment enforcement agent”) (emphasis added). Payton was well within this tradition when it relied on the special privacy of the home to justify a warrant requirement for arrests inside the home. Santana was also within this tradition when it held that an arrest was “public” where the suspect had relinquished that expectation of privacy-
But it would be inconsistent with these cases to extend Payton to cases where privacy is not implicated, simply because the officer crossed the property-law plane of the door. The Court has eschewed such a property-based approach. See, e.g., Oliver v. United States, 466 U.S. 170, 183-84, 104 S.Ct. 1735, 1743-44, 80 L.Ed.2d 214 (1984); Frazier v. Cupp, 394 U.S. 731, 740, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969). Moreover, it has avoided relying on property law concepts even when analyzing cases that involve the home. See, e.g., Kyllo v. United States, 533 U.S. 27, 32, 121 S.Ct. 2038, 2042, 150 L.Ed.2d 94 (2001) (“We have ... decoupled violation of a person’s Fourth Amendment rights from trespassory violations of his property.”); United States v. Karo, 468 U.S. 705, 712-13, 104 S.Ct. 3296, 3302, 82 L.Ed.2d 530 (1984) (“The existence of a physical trespass is only marginally relevant to the question of whether the Fourth Amendment has been violated ... for an actual trespass is neither necessary nor sufficient to establish a constitutional violation.”); Warden v. Hayden, 387 U.S. 294, 304, 87 S.Ct. 1642, 1648, 18 L.Ed.2d 782 (1967); Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734 (1961). It would thus be inconsistent with the Court’s overall approach to adopt a plane-of-the-door rule here. Santana is consistent with the Court’s dominant Katz approach, and even cited Katz in its reasoning section. It recognizes that where the privacy of the home has been relinquished, the home arrest rule has no application.
Finally, Santana contains the correct reading of the Fourth Amendment because that reading is the more reasonable one. The “touchstone” of the Fourth Amendment is reasonableness. See, e.g., Samson v. California, — U.S. -, 126 S.Ct. 2193, 2201, 165 L.Ed.2d 250 (2006); Brigham City v. Stuart, — U.S. -, 126 S.Ct. 1943, 1947, 164 L.Ed.2d 650 (2006); Bd. of Educ. v. Earls, 536 U.S. 822, 828, 122 S.Ct. 2559, 2564, 153 L.Ed.2d 735 (2002). The reasonableness requirement applies with equal force to the home. In Maryland v. Buie, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), the Court stated:
Our cases show that in determining reasonableness, we have balanced the intrusion on the individual’s Fourth Amendment interests against its promotion of legitimate governmental interests .... Under this test, a search of the house or office is generally not reasonable without a warrant issued on probable cause. There are other contexts, however, where the public interest is such that neither a warrant nor probable cause is required.
Id. at 331, 110 S.Ct. at 1096-97. See also Stuart, 126 S.Ct. at 1947; Illinois v. McArthur, 531 U.S. 326, 331, 121 S.Ct. 946, 950, 148 L.Ed.2d 838 (2001) (where search “avoid[ed] significant intrusion into the home itself,” the Court said, “rather than employing a per se rule of unreasonableness, we balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable”).
Here, the balance of privacy-related and law-enforcement-related concerns clearly points in favor of the Santana rule. By hypothesis, the privacy interest is minimal or nonexistent because the suspect has exposed his doorway to the officers and relinquished any privacy interest therein. On the government side of the balance, in *1261 addition to the government’s obvious interest in arresting the suspect, there is a strong governmental interest in officer safety. The Court has long recognized that officer safety is a concern whenever officers and arrestees or potential arres-tees are in close proximity. See, e.g., United States v. Robinson, 414 U.S. 218, 226, 94 S.Ct. 467, 472, 38 L.Ed.2d 427 (1973) (adopting search-incident-to-arrest rule in part for officer-safety rationale); Chimel v. California, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969) (authorizing limited warrantless and suspi-cionless search of home incident to lawful arrest of suspect for officer-protection rationale).
In Buie the Court candidly acknowledged the risks officers face when they arrest a suspect in the home. There the Court allowed a limited warrantless safety sweep of the home, incident to arrest of a suspect, upon reasonable suspicion, and noted:
The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter. A Terry or Long frisk occurs before a police-citizen confrontation has escalated to the point of arrest. A protective sweep, in contrast, occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime. Moreover, unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary’s “turf.” An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings.
Buie, 494 U.S. at 333, 110 S.Ct. at 1098. When a suspect answers a knock at the door, and probable cause exists to arrest that suspect, this same officer safety rationale is if anything more pressing. The officers and the actual suspect are separated by arm’s length only. Requiring actual exigent circumstances to develop, say by the suspect drawing a gun, could be fatal in many situations. And there is little or no price for ensuring officer safety by allowing the arrest, because there is no privacy interest at stake.
By contrast, the majority opinion’s rule allows a suspect for whom there is probable cause to open the door and thumb his nose in officers’ faces so long as exigent circumstances do not exist. The majority rule serves no Fourth Amendment interest, because by hypothesis the privacy interest has been relinquished. And it subjects officers to the risk of danger. Nor is it improper for officers to knock on a door without a warrant when the public could do so. See United States v. Taylor, 458 F.3d 1201, 1204 (11th Cir.2006). In some cases there may not even have been a prior opportunity to get a warrant. Cases show that officers legitimately find themselves at an open door with probable cause and no warrant in a variety of situations where exigent circumstances are not yet present. See, e.g., United States v. Gori, 230 F.3d 44, 47 (2d Cir.2000) (officers conducting stakeout observed by delivery person, accompanied delivery person to door because worried that delivery person would notify suspects); United States v. Vaneaton, 49 F.3d 1423, 1425 (9th Cir.1995) (officers investigating notorious itinerant burglar happened to come across him staying at the same motel where crime committed); United States v. Sewell, 942 F.2d 1209, 1211 (7th Cir.1991) (probable cause developed at the open door). In addition, the Santana rule does not discourage officers from obtaining warrants, as there is no guarantee that anyone (much less the suspect) will answer the door when officers come knocking. By contrast, the plane-of-the-door rule ties officers’ hands in a potentially volatile situation, and precludes them from taking pre *1262 ventive action that might save officers’ lives. It is thus unreasonable, in addition to being inconsistent with precedent.
Because of all of the reasons supporting the Santana rule — its precedential authority, its consistency with Payton, its consistency with Fourth Amendment jurisprudence, and its reasonableness — most courts considering the doorway arrest situation have followed the Santana rule. See United States v. Gori, 230 F.3d 44, 52 (2d Cir.2000);[8] McKinnon v. Carr, 103 F.3d 934, 935 (10th Cir.1996); United States v. Vaneaton, 49 F.3d 1423, 1427 (9th Cir.1995); United States v. Sewell, 942 F.2d 1209, 1212 (7th Cir.1991); Duncan v. Storie, 869 F.2d 1100, 1102 (8th Cir.1989) (but finding fact issue on voluntariness); United States v. Carrion, 809 F.2d 1120, 1128 (5th Cir.1987) (following Santana and United States v. Mason, 661 F.2d 45, 47 (5th Cir. Nov.9, 1981)); City of Fargo v. Steffan, 639 N.W.2d 482, 484 (N.D.2002); State v. Santiago, 224 Conn. 494, 619 A.2d 1132, 1135 (1993); People v. Morgan, 113 Ill.App.3d 543, 69 Ill.Dec. 590, 447 N.E.2d 1025, 1028 (1983); State v. Patricelli, 324 N.W.2d 351, 354 (Minn.1982).[9] The cases following the plane-of-the-door approach are less numerous and; on the whole, less well reasoned. See United States v. Bradley, 922 F.2d 1290, 1295 (6th Cir.1991); State v. Clark, 844 S.W.2d 597, 599 (Tenn.1992) (following Payton, though without citing Santana); State v. Ault, 150 Ariz. 459, 724 P.2d 545, 552 (1986) (holding doorway arrest illegal, though without citing Payton or Santana); State v. Holeman, 103 Wash.2d 426, 693 P.2d 89, 91 (1985) (following Payton, though without citing Santana); State v. Morse, 125 N.H. 403, 480 A.2d 183, 186 (1984) (following Payton); State v. George, 210 Neb. 786, 317 N.W.2d 76, 80 (1982) (same, without citing Santana). For example, only two of the cases following the plane-of-the-door approach even cited Santana: Bradley and Morse.[10] The Santana approach should *1263 be the law of this circuit, for the reasons discussed in detail above.[11]
As Santana is so clearly on point, the majority opinion also attempts to distinguish Santana on its facts. The majority opinion asserts that McClish was not as exposed to public view as Santana was; that Santana was not clearly inside her home; that Santana’s home was on a public street; that Santana was already on the threshold when police arrived; and that Santana’s home was being used for drug *1264 activity. But Santana’s holding did not rely on any of these facts.[12] Even the fact that Santana was half inside and half outside the home was not relied upon in the opinion. That fact was mentioned in the facts section of the opinion, not the reasoning section. See Santana, 427 U.S. at 40 n. 1, 96 S.Ct. at 2408 n. 1. The reasoning of Santana was brief and to the point: “She was not in an area where she had any expectation of privacy.” Id. at 42, 96 S.Ct. at 2409. The case relied simply on the absence of an expectation of privacy.
Similarly, McClish had no expectation of privacy in the immediate doorway area after he voluntarily opened the door. In my judgment, the Santana rule controls the instant case. It contains a holding that is directly on point, in contrast to the dicta about “threshold” in Payton. It allows a warrantless arrest only when the suspect has voluntarily relinquished the privacy protected by Payton, and is thus consistent with Payton’s, privacy-protection rationale. It is more consistent with Fourth Amendment law in general, as it does not create a bright-line rule, or rely on the property law concept of the plane of the door. Finally, it achieves a workable balance between the public and private interests at stake. I submit that the officers did not violate McClish’s Fourth *1265 Amendment rights by reaching through the plane of the voluntarily opened door. I therefore respectfully dissent from that portion of the opinion holding that the officers violated the Constitution.

. Because we hold that the law was not clearly established at the time of the relevant conduct, it would not be necessary to address the constitutional issue in this case but for the Supreme Court’s admonition in Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001) ("A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer’s conduct violated a constitutional right? This must be the initial inquiry.”). Unfortunately, in this case, because the defendants prevailed on the clearly established prong, the Saucier rule not only requires a constitutional holding that would be unnecessary otherwise; it also operates to insulate from further appellate review an erroneous constitutional ruling that will guide the conduct of police officers in three states. See Brosseau v. Haugen, 543 U.S. 194, 202, 125 S.Ct. 596, 601, 160 L.Ed.2d 583 (2004) (Breyer, J., joined by Scalia & Ginsburg, JJ., concurring). Also, under the Saucier approach, a court is handicapped in addressing the constitutional issue because at least one party often has little incentive to litigate the issue vigorously, especially when it is apparent that the law is not clearly established, as in this case. Similarly, only the Supreme Court's mandate provides an incentive for busy federal judges to focus intently on the issue; they lack the usual incentive that proper resolution of the matter will make a real difference to a real party. For these reasons and others, twenty-eight states and Puerto Rico have recently urged the Supreme Court in an amicus brief to reconsider its mandatory Saucier approach to qualified immunity. See Brief for 28 States and Puerto Rico as Amici Curiae in Support of Petitioner, Scott v. Harris, No. 05-1631 (Supreme Court, December 2006).

. Viewing the facts in the light most favorable to McClish, no reasonable jury could conclude that the door was not opened voluntari *1254 ly. Under McClish’s version of the facts, the officers knocked on the door; McClish asked who was there; the officers answered "Sheriff’s Office”; and McClish opened the door and asked "What happened?” before being arrested. There is no evidence of any show of force by the police that could have coerced McClish into opening the door, nor is there any evidence that McClish felt coerced.

. As Pitt was speaking at a debate about searches incident to the excise tax on cider, see Miller v. United States, 357 U.S. 301, 307, 78 S.Ct. 1190, 1195, 2 L.Ed.2d 1332 (1958), he was not intending to make any nuanced legal point. See Steagald v. United States, 451 U.S. 204, 229-30, 101 S.Ct. 1642, 1656, 68 L.Ed.2d 38 (1981) (Rehnquist, J., dissenting) (making the point that Pitt’s statement was rhetoric, not legal opinion, and noting that "parliamentary speaking ability and analytical legal ability ought not to be equated with one another”).

. The majority also characterizes Santana as a "hot pursuit” case. It is true that Santana’s second holding, the hot pursuit holding, is the one more often cited. But that is simply a function of the relative frequency of litigated doorway arrest cases versus litigated hot pursuit cases. For example, it took more than thirty years for the doorway arrest scenario to *1256 be squarely presented to this Court. The Santana Court clearly considered the first holding to be a necessary one: it had to address the legality of the arrest because it established that the officers did not impermissibly create the hot pursuit exigency. See Santana, 427 U.S. at 42, 96 S.Ct. at 2409.

. The fact that the Court did not overrule Santana is itself reason enough to reject the majority opinion's rule. The Court in Santana said that arrests on the threshold without a warrant are legal. But common sense tells us that an officer conducting an arrest at the literal threshold would necessarily cross the plane of the door in a great many threshold arrests. The majority rule is thus facially inconsistent with Santana’s holding, and in effect overrules a Supreme Court precedent on the basis of dicta in another Supreme Court opinion.

. To a lesser extent, Payton relied on the status of warrantless in-home arrests under the common law. Watson, which established that warrantless public arrests are constitutional, relied in significant part on the common law's acceptance of such seizures. See Watson, 423 U.S. at 418, 96 S.Ct. at 825. Payton, on the other hand, concluded that the common law sources were at best equivocal as to the status of arrests without a warrant inside the home. Payton, 445 U.S. at 596-98, 100 S.Ct. at 1385-86. This was another reason, in addition to the special privacy of the home, for departing from the Watson rule.
The Supreme Court has recognized, however, that the common law generally permitted a warrantless arrest inside the home when the outer door was open. See Steagald v. United States, 451 U.S. 204, 217 n. 11, 101 S.Ct. 1642, 1650 n. 11, 68 L.Ed.2d 38 (1981) (“Under the common law, a privilege attaches to the outer door of a dwelling, because ... it is the owner’s castle .... Thus, an open outer door was apparently regarded as the equivalent of a consent of the occupant for the constable to enter the home and conduct a search.”) (internal punctuation omitted). The common law sources appear to confirm the Court's statement. For example, Coke, who was interpreted in Payton as proscribing war-rantless in-home arrests, appeared to accept such arrests where the door was open. See 4 E. Coke, Institutes *178 ("[I]f the door of the house be open, [the constable] may enter into the same, and arrest the party.”); see also Semayne’s Case, 5 Co. Rep. 91a, 77 Eng. Rep. 194 (K.B.1603) (cited in Payton, 445 U.S. at 592, 100 S.Ct. at 1383) ("That in all cases when the door is open, the sheriff may enter the house and do execution at the suit of any subject, either of the body or of the goods, and so may the lord in such case enter the house and distrain for his rent or service.”); M. Foster, Crown Law 319-20 (1762); 4 W. Blackstone, Commentaries *289. Because the common law apparently permitted open door arrests without a warrant, Santana is as consistent with Payton's common-law rationale as it is with Payton's privacy-protection rationale.

. The majority opinion not only asserts that Payton established a bright-line rule, but also argues that the line has been “re-inked” many times. But the cited cases all simply quoted the language of Payton on their way to holdings that did not involve a voluntarily opened *1259 door. In Kirk v. Louisiana, 536 U.S. 635, 636, 122 S.Ct. 2458, 2458, 153 L.Ed.2d 599 (2002), the officers entered well into the interior of the home, without the justification of exigent circumstances. In New York v. Harris, 495 U.S. 14, 15, 110 S.Ct. 1640, 1642, 109 L.Ed.2d 13 (1990), the suspect did not open the door voluntarily, as the police displayed their guns and badges to get the suspect to open the door. In Steagald v. United States, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), the issue was whether police need a search warrant (in addition to an arrest warrant) to arrest a third party in someone else's home; the Court concluded that police do need a search warrant. But police intruded well inside the home, and the case merely repeated the rhetoric from Payton in a quotation, without expressing a view on the doorway arrest situation. Id. at 206, 101 S.Ct. at 1644.
The majority finds its strongest language in Kyllo v. United States, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). But Kyllo involved neither a doorway nor an arrest. The majority opinion’s quotes from Kyllo were also not talking about a bright line at the door. The first quote says that "the Fourth Amendment draws a firm line at the entrance to the house .... That line, we think, must be not only firm, but also bright — which requires clear specification of those methods of surveillance that require a warrant." Id. at 40, 121 S.Ct. at 2046. There the Court was not talking about a plane-of-the-door rule at the opened door, but rather was choosing the relatively bright-line, categorical test for when surveillance equipment can be used to observe a home. As in other Fourth Amendment bright-line-rule cases, the Court explicitly justified its bright-line rule.
The second quote is, "[W]e [have] made clear that any physical invasion of the structure of the home, by even a fraction of an inch, [is] too much, and there is certainly no exception to the warrant requirement for the officer who barely cracks open the front door and sees nothing but the nonintimate rug on the vestibule floor.” Id. at 37, 121 S.Ct. at 2045. Here too the Court was not ratifying a bright-line rule at the opened doorway, but rather responding to an argument by the government that only techniques that detect "private details” of home life are searches. The Court was making the point that any detail, even one a fraction of an inch inside the door, is considered private. The Court did not opine on what happens at the opened door, where the suspect voluntarily reveals some of those private details. Kyllo, like Payton, simply was not an opened doorway arrest case. And its rationale, like Paytons, does not apply where the suspect has voluntarily relinquished some of the privacy of the home.
The Eleventh Circuit cases cited in the constitutional section of the majority’s opinion are also inapposite (as they must be, since we hold that the law was not clearly established in Florida at the time of the relevant conduct). See Bashir v. Rockdale County, 445 F.3d 1323, 1326 (11th Cir.2006) (suspect entered home without inviting police, police followed him inside, penetrating well into interi- or before arresting); Knight v. Jacobson, 300 F.3d 1272, 1277-78 (11th Cir.2002) (arrest took place after suspect left the home, therefore Payton did not apply); United States v. Santa, 236 F.3d 662, 666 (11th Cir.2000) (officers entered well into interior of home without warrant, no exigent circumstances); United States v. Parr, 716 F.2d 796, 814 (11th Cir.1983) (no exigent circumstances where firefighter intruded well inside home). These cases simply repeated the Payton dicta as a figurative or shorthand way of referring to "the home.” Just as the Payton Court did.

. I acknowledge there is some tension between Gori and a pre-Payton Second Circuit decision, United States v. Reed, 572 F.2d 412 (2d Cir.1978). In any event, my position is considerably narrower than Gori: I would hold that an officer may intrude no further than the area that has been voluntarily exposed, whereas Gori appeared to allow an officer to seize anyone who might be visible through the opened door, even if located outside the immediate doorway area.

. The majority opinion cites Loria v. Gorman, 306 F.3d 1271, 1284 (2d Cir.2002). This case dealt with a classic Payton situation, where the officer pushed open the door and forced his way inside to arrest the suspect. See Loria, 306 F.3d at 1286 ("Loria was not in the doorway. Rather, he was at least a door’s width inside the house when he attempted to close the door.”). The Second Circuit appears to adhere to the Santana rule at the open door. See United States v. Gori, 230 F.3d 44, 52 (2d Cir.2000) ("The facts critical to the analysis are that the interior of Apartment 1M was exposed to public view when the door was voluntarily opened. And the principle that governs those facts is found in United States v. Santana, not Payton.”). But cf. United States v. Reed, 572 F.2d 412 (2d Cir.1978).

.The majority opinion also argues that "few, if any” of the cases cited in this paragraph involved a physical crossing of the plane of the door. One of the cases definitively involved a reaching across the plane of the door. See City of Fargo v. Steffan, 639 N.W.2d 482, 483 (N.D.2002). Other cases did not specify whether the arrest was physical or non-physical, instead simply stating that an "arrest” occurred. See United States v. Whitten, 706 F.2d 1000, 1015 (9th Cir.1983); United States v. Mason, 661 F.2d 45, 47 (5th Cir. Nov.9, 1981); State v. Santiago, 224 Conn. 494, 619 A.2d 1132, 1135 (1993); State v. Patricelli, 324 N.W.2d 351, 352 (Minn.1982). Because the cases involved doorway arrests, common sense indicates that at least some of them are bound to have involved a physical crossing. Moreover, it makes sense that those opinions did not specify the precise means of the arrest, because they relied not on whether the plane of the door was crossed, *1263 but rather on the absence of an expectation of privacy.
Still other cases involved facts where the suspect opened the door and the officers accomplished the arrest by non-physical means. For example, in some cases the officer arrested the suspect by telling the suspect he was under arrest; in others by pointing a gun at the suspect. But in almost all of these cases, the reasoning was not based on the absence of a physical crossing. These courts upheld the arrest not because it was non-physical, but rather because the suspect no longer had an expectation of privacy. See United States v. Gori, 230 F.3d 44, 47 (2d Cir.2000) (officer said “Everyone step out into the hallway!”); McKinnon v. Carr, 103 F.3d 934, 935 (10th Cir.1996) (officers told suspect he was under arrest, then followed him into home to retrieve his clothes); United States v. Vaneaton, 49 F.3d 1423, 1425 (9th Cir.1995) (officer told suspect he was under arrest, then entered hotel room); United States v. Carrion, 809 F.2d 1120, 1123 (5th Cir.1987) (officer pointing gun ordered suspect to raise hands, then entered room to physically arrest); People v. Morgan, 113 Ill.App.3d 543, 69 Ill.Dec. 590, 447 N.E.2d 1025, 1027 (1983) (officers told suspect he was under arrest, then accompanied into home to obtain clothes). In fact, in McKinnon, Vaneaton, Carrion, and Morgan, the officers physically crossed the plane of the door immediately after initiating the arrest. These cases are thus legally indistinguishable from the instant case, where the officers also violated no expectation of privacy.
Only two jurisdictions appear to recognize a distinction between physical and non-physical arrests. The Seventh and Eighth Circuits require officers to announce their intention to arrest before physically crossing the plane of the door. Compare United States v. Sewell, 942 F.2d 1209, 1210 (7th Cir.1991) (arrest constitutional where officers arrested suspect at the door, before entering the apartment) with United States v. Berkowitz, 927 F.2d 1376, 1385-88 (7th Cir.1991) (arrest unconstitutional where officers crossed plane before announcing suspect was under arrest). See also Duncan v. Stone, 869 F.2d 1100, 1103 (8th Cir.1989) (version of facts where officers told suspect he was under arrest and told him to come out of house would state no constitutional violation, but version where officers physically arrested before telling suspect he was under arrest would be unconstitutional). However, the distinction made in these cases is not well founded. Whether the officer accomplishes the arrest by reaching across the plane of the door or by pointing a gun, if the officer has not violated an expectation of privacy, he has not violated the Fourth Amendment under Santana.

. The Fourth Circuit dealt with a doorway arrest scenario in United States v. McCraw, 920 F.2d 224 (4th Cir.1990), a case cited in the majority opinion. But there the suspect opened the door only a crack, and therefore did not relinquish his Payton expectation of privacy. Id. at 228. As a result, the Court was not dealing with a true Santana situation, and did not have occasion to consider what rule should apply at the voluntarily opened doorway. In fact, the Fourth Circuit explicitly recognized that "Mathis did not relinquish completely his expectation of privacy.” Id. at 229. McCraw therefore did not settle whether Santana or Payton applies in the Fourth Circuit.
As discussed supra, note 10, the Seventh and Eighth Circuits have adopted a modified Santana approach. They require officers to announce an intention to arrest before physically crossing the plane of the door. But since these circuits allow an arrest to occur at the open door without a warrant where the suspect is firmly inside the home, and since they appear to allow officers to cross the plane so long as they first announce their intention to arrest, they should be counted as having substantially adopted the Santana approach.
The majority opinion also attempts to distinguish some of the cases adopting the Santana approach on their facts. But these factual distinctions are of limited relevance, given that the cases clearly adopted the reasoning of Santana at the open doorway: rea *1264 soning based only on the expectation of privacy or lack thereof.

. Moreover, many of these factual distinctions cannot play any role under the Fourth Amendment. The location of Santana’s home in an urban area cannot have reduced her Fourth Amendment protection: distinctions among kinds of homes would give less Fourth Amendment protection to the "ruined tenement,” in violation of the Pitt quote. The presence of drug activity cannot be relevant: that would eviscerate the Payton rule by allowing officers to enter when they have probable cause of criminal activity, when Paytons whole purpose is to require a warrant even when officers have the strongest suspicion of criminal activity. Finally, the majority opinion says that the "Court found significant” the fact that Santana retreated into her home and held money given to her in a drug transaction. These facts, however, were relevant to the hot pursuit portion of the opinion, not the arrest portion. See Santana, 427 U.S. at 40-41, 96 S.Ct. at 2408-09.
The majority opinion also suggests that Santana might be distinguishable because of the route the officers took to get to McClish’s front door. However, McClish has waived any argument based on the officers’ approach, and therefore cannot contend that they did not have a right to be in their location on the porch. As the majority opinion notes, "[ajlthough the legality of the officers' entry onto the porch was argued in the district court, this issue was not raised on appeal and, in light of our holding today, does not need to be addressed.”
Such an argument, even if raised, likely would have been unsuccessful. According to the district court, the gate that the officers opened, and that had a "no trespassing” sign on it, was not even on McClish's property and thus was not located within the curtilage of his home. It therefore most likely was not protected by the Fourth Amendment. See Oliver v. United States, 466 U.S. 170, 178, 104 S.Ct. 1735, 1741, 80 L.Ed.2d 214 (1984) ("[A]n individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home.”); United States v. Taylor, 458 F.3d 1201, 1208 (11th Cir.2006) ("A perimeter fence around property does not create a constitutionally protected interest in all the open fields on the property.”).
Then, when the officers did cross McClish’s curtilage to reach his front door, they in all likelihood did not violate the Fourth Amendment because they took the path that any visitor would have taken to knock on the front door. See Taylor, 458 F.3d at 1204 ("The Fourth Amendment ... is not implicated by entry upon private land to knock on a citizen’s door for legitimate police purposes unconnected with a search of the premises .... Absent express orders from the person in possession, an officer may walk up the steps and knock on the front door of any man’s ‘castle,’ with the honest intent of asking questions of the occupant thereof.”). In any event, because McClish waived any reliance on those facts, we need not decide whether the approach to the door violated the Fourth Amendment.